[Cite as *Universal Real Estate Solutions, Inc. v. Snowden*, 2014-Ohio-5813.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| UNIVERSAL REAL ESTATE SOLUTIONS, INC. | C.A. No. 27171 |
| Appellant/Cross-Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO CASE No. CV-2012-02-0743 |
| RANDY SNOWDEN, et al. | |
| Appellees/Cross-Appellant | |

DECISION AND JOURNAL ENTRY

Dated: December 31, 2014

WHITMORE, Judge.

{¶1} Appellant/Cross-Appellee, Universal Real Estate Solutions, Inc., appeals from the judgment of the Summit County Court of Common Pleas. Appellee/Cross-Appellant, Randy Snowden, appeals from the same judgment. This Court affirms in part and reverses in part.

I

{¶2} In May 2002, Randy Snowden and William Wendell formed Universal Real Estate Solutions, Inc. ("Universal"). Snowden and Wendell were the only shareholders in the corporation and each owned fifty percent of the shares. Universal was in the business of buying, repairing, and selling real estate. The company also rented properties it owned. According to the Shareholder's Agreement, Snowden was responsible for finding properties to buy, negotiating the purchase price, and maintaining the properties in its inventory. Wendell was responsible for funding the corporation until it could obtain bank financing. Universal was to

pay Wendell interest on any loans he made to the company. Net profits from the sale of any properties were to be split evenly between Snowden and Wendell.

**R & S Deal**

{¶3} In April 2005, R & S Land Co., L.L.C. ("R & S"), a company partially owned by Snowden, purchased properties from Universal for $250,000. Snowden, who was fifty percent owner of R & S, signed the settlement statement on behalf of Universal. Shortly thereafter, the properties were sold by R & S to David and Brenda Gregory for $291,000.[1] According to Snowden, R & S only received a portion of the purchase price and structured the balance as an installment sale, which R & S financed. The Gregorys defaulted on the installment contract and discharged their debt to R & S in bankruptcy.

**Florida Deal**

{¶4} In 2005, Universal sought to invest in property in Florida. Snowden testified that he was able to secure a corporate bank loan, but Wendell refused to supply the necessary collateral. According to Snowden, he decided to purchase some Florida real estate lots himself because the value of property was quickly increasing. In February 2006, Snowden paid $150,000 for five lots.[2] In March 2006, Snowden sold the five lots to Universal for $170,000.

**Sanders Deal**

{¶5} In late 2006, Snowden was approached by Dale Sanders with a real estate proposal. Sanders was looking to sell 17 houses. According to Snowden, Wendell was not interested in Universal purchasing the properties because of their condition. Snowden, then, purchased the properties using Vernon Realty, a company wholly owned by Snowden, for

---

[1] There was conflicting testimony regarding the Gregorys' purchase price. However, the trial court found the purchase price to be $291,000. This finding has not been challenged on appeal.

[2] Snowden, ultimately, only paid $145,000 for the lots because he was given a discount for paying off his loans early through the sale to Universal.

$287,000. In August 2007, Vernon Realty sold the same properties to Universal for $399,000. The purchase contract noted Snowden was a company officer and part owner of both the buying and selling corporations. Snowden signed the contract as both the buyer and the seller.

{¶6} In 2009, Snowden sold his Universal shares to Wendell for $1.00 and Wendell assumed all responsibility for Universal's debt. Prior to the sale, Snowden informed Wendell that he was issuing a corporate check to Best Value Rentals, a company owned by Snowden, for reimbursement of two employees' salaries who had performed work for Universal over the prior two years.

{¶7} In 2012, Universal filed suit against Snowden alleging breach of contract, breach of fiduciary duty, conversion, and fraud. After a bench trial, the court found Snowden had breached his fiduciary duty, but found for Snowden on the remaining claims. The court calculated Snowden's profits on the three land transactions at $60,456 and awarded Universal this amount in damages.

{¶8} Universal now appeals and raises five assignments of error for our review. Additionally, Snowden cross-appeals and raises two assignments of error.

II

Universal's Assignment of Error Number One

THE TRIAL COURT ERRED WHEN IT FAILED TO FIND MALICE OR FRAUD AND AWARD PUNITIVE DAMAGES.

{¶9} In its first assignment of error, Universal argues that the greater weight of the evidence supports a finding that Snowden acted with malice and/or committed fraud. Further, Universal argues that because there was malice or fraud it is entitled to punitive damages.

{¶10} In a challenge to the weight of the evidence:

[t]he [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.

(Alterations sic.) (Internal quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "This presumption arises because the trial judge had an opportunity 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶11} The trial court's application of the law, however, raises a question of law. *Fuline v. Green*, 9th Dist. Summit No. 26586, 2013-Ohio-2171, ¶ 6. This court reviews questions of law de novo. *Id.* "A de novo review requires an independent review of the trial court's decision without any deference to the trial court's determination." *State v. Ross*, 9th Dist. Summit No. 26694, 2014-Ohio-2867, ¶ 33, quoting *State v. Consilio*, 9th Dist. Summit No. 22761, 2006-Ohio-649, ¶ 4.

**Fraud**

{¶12} To establish fraud, a plaintiff must prove:

(1) a representation (or concealment of a fact when there is a duty to disclose) (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance.

*Volbers-Klarich v. Middletown Mgt., Inc.*, 125 Ohio St.3d 494, 2010-Ohio-2057, ¶ 27, citing *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St.3d 69, 73 (1986). "[O]ne who fails to disclose

material information *prior to the consummation* of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" (Alterations sic and emphasis added.) *State v. Warner*, 55 Ohio St.3d 31, 54 (1990), quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980). This affirmative duty to disclose, however, is not without its limitations. *Isroff v. Westhall Co.*, 9th Dist. Summit No. 14184, 1990 WL 15192, *3 (Feb. 21, 1990).

> Courts have often found no affirmative duty to disclose in situations where the complainant was intimately involved with the operation of the corporation, or where he had ready access to all relevant information or failed to make reasonable attempts to discover such information, or where the complainant's reliance on his fiduciaries was negated through resort to informed independent advisers, or where the complainant was responsible for speeding up the sale before fully evaluating the transaction.

*Id.*

**{¶13}** The trial court found that Snowden owed a fiduciary duty to Universal and therefore had "a duty to disclose the material facts of each transaction." The trial court further found that Snowden was not guilty of fraud because he had not concealed his self-dealing in the transactions. According to the trial court, the "information was contained in the documents and materials associated with the transactions, which were available to make such a determination upon inspection." However, because the documents associated with the Sanders Deal were not provided to Wendell prior to the sale, we do not agree that those documents fulfilled an affirmative duty to disclose.[3] *See Warner* at 54.

**{¶14}** The documents related to the Sanders Deal include a real estate purchase contract and a HUD-1 settlement statement. There is no evidence that the HUD-1 settlement statement

---

[3] At trial, Universal explained that its claim of fraud is "limited to the Sanders [D]eal" because the other transactions were barred by the statute of limitations. We limit our review accordingly.

was available to Snowden or Wendell prior to closing. This leaves only the purchase contract. While the purchase contract noted that Snowden was part owner of both the buying and selling companies, Snowden testified that he did not give the contract to Wendell until after the sale. Snowden specified that Wendell would have seen the purchase contract after the sale when either he or the title company sent it to Wendell. Snowden had a fiduciary duty to disclose all material facts *prior* to the commission of the transaction. *See Warner* at 54.

{¶15} Yet, as discussed above, an affirmative duty to disclose may be limited under certain circumstances, e.g., complainant failed to make reasonable attempts to discover information. It does not appear, however, that the trial court considered these limitations. Because the documents involved in the Sanders Deal did not fulfill Snowden's affirmative duty to disclose, we reverse and remand the case for the court to consider whether Snowden's duty was limited under the circumstances and, if necessary, the remaining elements of fraud.

**Malice & Punitive Damages**

{¶16} Universal further argues that the trial court erred finding that Snowden did not act with malice.

{¶17} Punitive damages may be awarded upon a finding of fraud or actual malice. *Preston v. Murty*, 32 Ohio St.3d 334, 334 (1987). "'Actual malice' for these purposes is '(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" (Emphasis sic.) *Calmes v. Goodyear Tire & Rubber Co.*, 61 Ohio St.3d 470, 473 (1991), quoting *Preston* at syllabus.

{¶18} Because the issue of malice is inextricably intertwined with the issue of punitive damages, we conclude that Universal's argument is not ripe for review at this time. We have

previously determined the case must be remanded to the trial court for it to consider the issue of fraud. Once the trial court decides the issue of fraud, it must consider whether punitive damages are available and, if so, whether they are appropriate.

{¶19} Universal's first assignment of error, as it relates to its claim of fraud, is sustained. Its first assignment of error, as it relates to malice and punitive damages, is not ripe for review.

<u>Universal's Assignment of Error Number Two</u>

THE TRIAL COURT ERRED WHEN IT FAILED TO AWARD DAMAGES FOR BREACH OF FIDUCIARY DUTY FOR THE NEGATIVE VALUE OF UNIVERSAL.

{¶20} In its second assignment of error, Universal argues that "Snowden, as the person responsible for the real estate transactions on behalf of the corporation, should bear the liability of the [negative valuation of the corporation] where fraud and/or breach of fiduciary duty is found." Universal, however, has waived this argument on appeal.

{¶21} In its written memorandum to the trial court after trial, Universal argued that it was "due as damages its lost profits, which are calculated by deciding what Universal would have received, but for Snowden's wrongful acts, plus interest." It proceeded to detail the lost profits: $117,000 from the Sanders Deal, $45,000 from the Florida Deal, $70,000 from the R & S Deal, $35,000 for reimbursement of salaries, and $60,000 in interest. Universal never argued to the trial court that Snowden should be liable for the negative corporate valuation of $285,000. Because Universal did not seek damages for the negative value of the company, this issue may not be raised on appeal. *See Hoskinson v. Lambert*, 5th Dist. Licking No. 11-CA-18, 2011-Ohio-4616, ¶ 27 ("Appellant cannot assign as error an issue not raised before the trial court.").

{¶22} Universal's second assignment of error is overruled.

Universal's Assignment of Error Number Three

THE TRIAL COURT ERRED WHEN IT DETERMINED THAT UNIVERSAL
WAS NOT DUE FUNDS PAID TO AN UNDISCLOSED THIRD PARTY.

{¶23} In its third assignment of error, Universal argues that the court erred when it failed to order Snowden to reimburse Universal for $35,610 paid to Snowden's employees. Specifically, Universal argues that the plain language of the contract requires a finding that Snowden, and not Universal, is responsible for the $35,610. We disagree.

{¶24} "The interpretation of written contracts, including any assessment as to whether a contract is ambiguous, is a question of law subject to de novo review on appeal." (Internal quotations and citations omitted.) *Skidmore v. Natl. Bronze & Metal of Ohio*, 9th Dist. Lorain No. 12CA010328, 2014-Ohio-4423, ¶ 28. "'The purpose of contract construction is to effectuate the intent of the parties,' and that intent 'is presumed to reside in the language they chose to employ in the agreement.'" *State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 104 Ohio St.3d 559, 2004-Ohio-7102, ¶ 23, quoting *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 132 (1987). "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Retreat at Lake Medina Assn., Inc. v. Haller*, 9th Dist. Medina No. 13CA0092-M, 2014-Ohio-4266, ¶ 8, quoting *Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 140 Ohio St.3d 193, 2014-Ohio-3095, ¶ 9. "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions." *St. Croix, Ltd. v. Damitz*, 9th Dist. Summit Nos. 26565 & 26566, 2014-Ohio-1926, ¶ 9, quoting *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St.3d 635 (1992), syllabus.

{¶25} The Shareholder's Agreement states, in relevant part, that

Mr. Snowden is also responsible for acquiring insurance for the properties and hiring personnel to protect the properties from damage in the winter time, maintain the properties, and make property improvements through paint, carpet, electric, plumbing, drywall, and other up-grades as Mr. Snowden may specify.

\* \* \*

Mr. Snowden and Mr. Wendell are to be reimbursed for out-of-pocket expenses that include gasoline, hotel, seminar expenses, software purchases, and any other reasonable purchases that are made for the benefit of the corporation.

**{¶26}** Christine Hanlon testified that she is an employee of Best Value Rentals, a company owned by Snowden. Hanlon stated that 90% of her work was for Universal during the time Snowden was a shareholder. According to Hanlon, she collected rent for Universal properties, handled maintenance work orders, and performed other administrative tasks. Hanlon further testified that Justin English, another Best Value Rentals employee, primarily performed maintenance tasks for Universal. Hanlon's salary was paid by Best Value Rentals.

**{¶27}** Snowden testified that prior to selling his shares to Wendell, he told Wendell that he was issuing a check to reimburse Best Value Rentals for the salaries of Hanlon and English. Snowden stated that he faxed Wendell copies of the payroll records and issued a check for $35,610.

**{¶28}** Universal argues that, based on the plain language of the Shareholder's Agreement, Snowden may not reimburse Best Value Rentals for salaries of its employees who performed work for Universal. We disagree. First, the Shareholder's Agreement is silent on the manner, method, and expense of collecting rents from property owned by Universal. Further, the agreement does not detail whose responsibility it is to ensure the rents are collected. In that respect, the agreement is unclear. We, therefore, consider extrinsic evidence to determine the parties' intent. *See St. Croix, Ltd.*, 2014-Ohio-1926, at ¶ 9.

**{¶29}** Wendell testified that he had agreed to allow Snowden to hire maintenance and support staff. Specifically, Wendell stated that he and Snowden had "agreed that [Snowden] could hire Clarence or Salaway and * * * All City Property Management [for] some management and repairs and so on. [Additionally, Snowden] had Don Thomas collecting rents." Wendell further testified that he knew a female worked in Snowden's Warren office collecting rents for Universal. Wendell explained that he believed the Shareholder Agreement required Snowden to pay the cost of managing the properties, but acknowledged that the corporation paid for maintenance staff, and would pay for a plumber and an attorney to evict a tenant, if needed.

**{¶30}** Universal does not contest the assertion that Hanlon and English performed work for the corporation, only that Snowden should personally be responsible for paying for that work. However, the Shareholder Agreement is unclear how those costs should be covered and Wendell's testimony indicates that the parties agreed to have the corporation pay for certain business expenses, including maintenance staff and persons to help collect rent. We conclude that the court did not err in finding that Universal was not entitled to reimbursement of these funds.

**{¶31}** Universal's third assignment of error is overruled.

Universal's Assignment of Error Number Four

> THE TRIAL COURT ERRED WHEN IT DETERMINED THAT UNIVERSAL WAS NOT DUE THE PROFITS ON THE R & S LAND DEAL.

**{¶32}** In its fourth assignment of error, Universal argues that the court erred when it failed to award damages related to the R & S Deal.

**{¶33}** "Absent an abuse of discretion, this Court will not disturb a trial court's determination regarding damages." *Columbia Gas of Ohio, Inc. v. Perram Elec., Inc.*, 9th Dist. Lorain No. 04CA008569, 2005-Ohio-3795, ¶ 7, citing *Roberts v. United States Fid. & Guar.*

*Co.*, 75 Ohio St.3d 630, 634 (1996). An abuse of discretion indicates that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶34}** Universal sold property to R & S for $250,000. R & S then sold the property to David and Brenda Gregory for $291,000. Snowden testified that while the Gregorys' purchase price appears to reflect a profit to Snowden, the Gregorys only paid half and entered into an installment contract for the balance. R & S financed the installment contract. According to Snowden, the terms of the installment contract were that the Gregorys were to make interest only payments of $900 a month to R & S for five years, at which time a balloon payment would be due. The Gregorys defaulted on their payments and ultimately discharged their debt to R & S in bankruptcy.

**{¶35}** The trial court found that Universal was due in damages its lost profits on the three transactions: R & S Deal, Florida Deal, and Sanders Deal. However, the court found that because R & S did not realize a profit on the sale to the Gregorys, there were no lost profits to award Universal. One remedy available to an "aggrieved shareholder who brings an action for breach of fiduciary duties is the disgorgement of any profits resulting from the breach." *Stepak v. Schey*, 51 Ohio St.3d 8, 15 (1990) (Holmes, J., concurring).

**{¶36}** It appears that Universal is arguing that the trial court erred in considering only realized profits and not considering what R & S's profits would have been if the buyer had not declared bankruptcy. Universal cites no law to support its position. Because R & S did not actually receive any profits from the sale to the Gregorys, there were no profits to disgorge. Based on the limited argument before us, we cannot conclude that the trial court's decision was unreasonable, arbitrary, or unconscionable.

**{¶37}** Universal's fourth assignment of error is overruled.

Universal's Assignment of Error Number Five

THE TRIAL COURT ERRED WHEN IT FAILED TO AWARD INTEREST COSTS TO UNIVERSAL.

**{¶38}** In its fifth assignment of error, Universal argues that the trial court erred when it found the testimony was insufficient to determine an appropriate award of interest. Specifically, Universal argues that "the record shows there was an agreed upon amount of 10% interest between the parties on the loans provided by Wendell."

**{¶39}** Universal cites to its counsel's opening statement as evidence of the parties' agreement to 10% interest payments. As counsel is well aware, opening statements are not evidence. *See U.S. Aviation Underwriters, Inc. v. B.F. Goodrich Co.*, 149 Ohio App.3d 569, 2002-Ohio-5429, ¶ 28 (9th Dist.).

**{¶40}** The Shareholder Agreement provides that Wendell should be paid interest on loans made to Universal. The agreement, however, does not specify the interest amount to be paid to Wendell. Wendell did testify that in 2002, 2003, and 2004, the interest rate on his loan was much higher, "perhaps three points over prime." Wendell went on to say that he thought the prime rate at that time was "about seven percent, [ ] so the interest rate that [he] had was about – or it was ten percent in the beginning." Wendell further testified that the "[r]ates were much lower * * * as we got into [20]07" and "may have been around four and a half percent."

**{¶41}** Even assuming the parties had agreed to ten percent, this interest is calculated on the amount of money loaned to the company and not on the amount of profits rightfully due to Universal. The Sanders Deal occurred in August 2007 and the Florida Deal occurred in 2006. The testimony does not indicate how these deals were financed nor does the testimony establish what interest rates were applicable to those deals. Additionally, there was no testimony about

whether Universal had made any interest payments to Wendell on these loans. Assuming without deciding that Universal has standing to sue for interest owed to Wendell, we cannot conclude that the court erred in finding that "the testimony was insufficient to determine an appropriate award of interest."

**{¶42}** Universal's fifth assignment of error is overruled.

Snowden's Assignment of Error Number One

THE TRIAL COURT ERRED WHEN IT FOUND THAT MR. SNOWDEN HAD BREACHED A FIDUCIARY DUTY TO APPELLANT[.]

**{¶43}** In his first assignment of error, Snowden argues that the court erred in finding that he breached his fiduciary duty. Specifically, Snowden argues that he did not owe a fiduciary duty to Universal because it is a duty that exists between shareholders.

**{¶44}** Snowden's argument raises a question of law. This Court reviews issues of law de novo. *Swedlow v. Riegler*, 9th Dist. Summit No. 26710, 2013-Ohio-5562, ¶ 7. In conducting a de novo review, an appellate court does not give deference to the trial court's determination. *Akron v. Frazier*, 142 Ohio App.3d 718, 721 (9th Dist.2001).

**{¶45}** "[A] close corporation is a corporation with a few shareholders and whose corporate shares are not generally traded on a securities market." *Crosby v. Beam*, 47 Ohio St.3d 105 (1989), paragraph one of the syllabus. "Directors of a closely held corporation owe a fiduciary duty to both the corporation and to its shareholders." *Morgan v. Ramby*, 12th Dist. Warren Nos. CA2010-10-095 & CA2010-10-101, 2012-Ohio-763, ¶ 22, citing *Thompson v. Cent. Ohio Cellular, Inc.*, 93 Ohio App.3d 530, 540 (8th Dist.1984). "The principles which govern the fiduciary relationship between a corporation and its directors include a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing[,] and a duty of disclosure." *Wing Leasing, Inc. v. M & B Aviation, Inc.*, 44 Ohio App.3d 178, 181 (10th Dist.1988).

{¶46} The Shareholder Agreement between Snowden and Wendell is silent as to their titles in the corporation. However, the stock purchase agreement, through which Wendell purchased Snowden's shares, states that Snowden "resign[s] as an officer and director of [Universal]." Because a director owes a fiduciary duty to both the corporation and its shareholders, Snowden's argument is without merit. *See Morgan* at ¶ 22. *See also Genesis Respiratory Servs., Inc. v. Hall*, 99 Ohio App.3d 23, 28-29 (4th Dist.1994).

{¶47} Snowden's first assignment of error is overruled.

Snowden's Assignment of Error Number Two

THE TRIAL COURT ERRED IN AWARDING 100% OF THE DAMAGES TO APPELLANT WHEN AT THE TIME THAT THE DAMAGES WERE INCURRED, APPELLEE SNOWDEN OWNED 50% OF THE APPELLANT.

{¶48} In his second assignment of error, Snowden argues that the court erred in failing to reduce Universal's damages by one-half, the percentage of his interest in the corporation at the time. Specifically, Snowden argues that the court failed to consider that he, as an equal partner in Universal, shared the losses with Wendell.

{¶49} In support of his argument, Snowden cites *McLaughlin v. Beeghly*, 84 Ohio App.3d 502 (10th Dist.1992). The corporation in *McLaughlin* was a closely held business with three equal shareholders. *Id*. at 504-505. After one of the owners died, his estate sued the corporation and the other shareholders for "monies allegedly due [to] the estate." *Id*. at 505. The trial court found that one of the shareholders had "breached his duty to all shareholders and assessed" a damage amount. *Id*. at 508. The trial court, however, awarded the full amount of damages to the estate. *Id*. at 505. The Tenth District Court of Appeals reversed, holding that "[s]ince the unconscionable acts affected all of the shareholders, as well as the corporation itself,

the owners may only receive an award equal to their proportionate share of the ownership [in the corporation]." *Id*. at 508.

{¶50} We conclude *McLaughlin* is distinguishable. Here, the corporation, not the individual shareholder, filed suit. Moreover, Universal sought to recover portions of payments made by Universal to Snowden and/or his company. These funds are due to Universal, not to Snowden or Wendell. To conclude that Snowden only has to pay back a percentage of his profits, relative to the percentage of his ownership in the corporation, would effectively reward Snowden for his misconduct. We decline to reach such a result. Because the damages being recovered by Universal are monies due to the corporation and not to the shareholders individually, we conclude the court did not err in refusing to reduce the damages by the percentage of Snowden's ownership in the corporation.

{¶51} Snowden's second assignment of error is overruled.

### III

{¶52} Universal's first assignment of error, as it relates to its claim of fraud, is sustained. Its first assignment of error, as it relates to malice and punitive damages, is not ripe for review. Universal's remaining assignments of error are overruled. Snowden's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

BETH WHITMORE
FOR THE COURT

HENSAL, P. J.
CARR, J.
CONCUR.

APPEARANCES:

WARNER MENDENHALL, Attorney at Law, for Appellant.

THOMAS C. NADER, Attorney at Law, for Appellees.